UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL BIRDSALL,<br><br>Plaintiff,<br><br>-against-<br><br>PRA HEALTH SCIENCES INC., COLIN SHANNON, JEFFREY T. BARBER, ALEXANDER G. DICKINSON, LINDA S. GRAIS, JAMES C. MOMTAZEE, GLEN D. STETTIN, and MATTHEW P. YOUNG,<br><br>Defendants. | Case No.:   _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934</u>

Plaintiff, Michael Birdsall, by Plaintiff's undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

### <u>NATURE OF THE ACTION</u>

1.      This is an action brought by Plaintiff against PRA Health Sciences, Inc. ("PRA" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of PRA by ICON plc ("ICON").

2.      On February 24, 2021, PRA and ICON entered into an agreement and plan of merger

(the "Merger Agreement"), pursuant to which PRA will merge with and into ICON, with ICON continuing as the surviving company (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, PRA's common stock shareholders will be entitled to receive $80.00 in cash (the "Cash Consideration") and 0.4125 shares of ICON stock (the "Exchange Ratio" and, together with the Cash Consideration, the "Merger Consideration") for each share of PRA common stock that they own.  Based on ICON's price as of February 23, 2021, the last trading day before the public announcement of the signing of the Merger Agreement, the Merger Consideration was worth approximately $166.06 per share of PRA common stock.

4.      On or about April 28, 2021, in order to convince PRA's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by PRA's financial advisors, BofA Securities, Inc. ("BofA Securities") and UBS Securities LLC ("UBS" and together with BofA Securities, the "Financial Advisors") regarding the Proposed Transaction.

6.      The Proposed Transaction is expected to close in July of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled for June 15, 2021. Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise all corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to PRA's public common stockholders

sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, PRA's common stock trades on the Nasdaq Global Select Market ("Nasdaq"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of PRA common stock.

12.     Defendant PRA is a Delaware corporation with its principal offices located at 4130 ParkLake Avenue, Suite 400, Raleigh, North Carolina 27612.  PRA is one of the world's leading global contract research organizations by revenue, providing outsourced clinical development and data solution services to the biotechnology and pharmaceutical industries, with a global clinical development platform that includes more than 75 offices across North America, Europe, Asia, Latin America, Africa, Australia, and the Middle East, and with more than 19,000 employees worldwide. PRA's common stock trades on the Nasdaq under the ticker symbol "PRAH."

13.     Defendant Colin Shannon ("Shannon") is, and has been at all relevant times, the Company's Chief Executive Officer and Chairman of the Board of Directors of the Company.

14.     Defendant Jeffrey T. Barber ("Barber") is, and has been at all relevant times, a director of the Company.

15.     Defendant Alexander G. Dickinson ("Dickinson") is, and has been at all relevant times, a director of the Company.

16.     Defendant Linda S. Grais ("Grais") is, and has been at all relevant times, a director of the Company.

17.     Defendant James C. Momtazee ("Momtazee") is, and has been at all relevant times, a director of the Company.

18.     Defendant Glen D. Stettin ("Stettin") is, and has been at all relevant times, a director of the Company.

19.     Defendant Matthew P. Young ("Young") is, and has been at all relevant times, a director of the Company.

20.     The Defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

I.      **Background of the Company and the Proposed Transaction**

21.     Defendant PRA is a Delaware corporation with its principal offices located at 4130 ParkLake Avenue, Suite 400, Raleigh, North Carolina 27612.  PRA is one of the world's leading global contract research organizations by revenue, providing outsourced clinical development and data solution services to the biotechnology and pharmaceutical industries, with a global clinical development platform that includes more than 75 offices across North America, Europe, Asia, Latin America, Africa, Australia, and the Middle East, and with more than 19,000 employees worldwide. PRA's common stock trades on the Nasdaq under the ticker symbol "PRAH."

22.     PRA is organized into two reportable segments: Clinical Research and Data Solutions.  PRA's Clinical Research segment encompasses a broad array of services across the spectrum of clinical development programs and its Data Solutions segment provides data, analytics, technology, and consulting solutions to the life sciences market.  The Clinical Research and Data Solutions segments complement each other, and provide enhanced value to PRA's clients when delivered together, with each driving demand for the other.

23.     During the past few years, PRA has continued to execute a growth strategy that has resulted in PRA's strong reputation as a strategic partner of choice for biotechnology and small- to mid-sized pharmaceutical companies., which rely on full-service contract research organizations like PRA to deliver fast, effective, and thorough support throughout the clinical development and regulatory processes because they generally lack a global clinical development infrastructure.  PRA has leveraged its strong reputation and existing relationships with biotechnology and pharmaceutical companies to capture their additional business, and is well-positioned to take advantage of the strategic alliances with CROs that will be increasingly utilized by small- and mid-sized pharmaceutical companies over the next several years given the depth of PRA's relationships and

proven track record.

24.     Thus, as PRA continues to execute its growth strategies, it has positioned itself for

continued, sustained economic growth in the coming years.

25.     Indeed, along with the financial results that PRA released on November 4, 2020, just

a few months before the Proposed Transaction was announced, PRA issued a press release entitled

*PRA Health Sciences, Inc. Reports Third Quarter 2020 Results and Updates Full Year 2020*

*Guidance*, which reaffirmed its current strategies, stating in part:

> "I am very appreciative of the effort and focus of all of our employees despite the difficult
> health circumstances in the world today. As a result of this commitment, ***I am very pleased***
> ***to report revenue and earnings that were significantly better than the guidance we***
> ***provided in August and an increase to our 2020 guidance***. I am also happy to report
> another quarter of record level gross and net new business awards," said Colin Shannon,
> PRA's President and Chief Executive Officer. "Although we continue to experience
> challenges with the pandemic, we believe we will finish 2020 strong and are well-
> positioned for 2021."

26.     Thus, the Proposed Transaction comes at a time when PRA's future success was not

fully reflected by its share price.  The Proposed Transaction will "compensate" PRA's public

stockholders with Merger Consideration that fails to adequately compensate them for the intrinsic

value of their shares.

27.     Despite PRA's intrinsic value and growth prospects, the Individual Defendants are

agreeing to a merger that deprives PRA public shareholders of the ability to partake in the Company's

individual growth and instead cashes them out in part and dilutes the value of their shares with an

inadequate interest in ICON.  The Individual Defendants breached their fiduciary duties owed to

PRA's shareholders by agreeing to the Proposed Transaction for the unfair Merger Consideration,

and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will

cause Plaintiff and the Class to receive an inadequate Merger Consideration while Company insiders

receive millions of dollars in severance payments and accelerated vesting of their restricted stock

units.

## II.     The Announcement of the Proposed Transaction

28.     On February 24, 2021, ICON and PRA issued a joint press release to announce the

Proposed Transaction, which stated in part:

### ICON TO ACQUIRE PRA HEALTH SCIENCS, CREATING A WORLD LEADER IN HEALTHCARE INTELLIGENCE AND CLINICAL RESEARCH

- *The consolidation brings together two organizations with a history of robust growth and performance ready to build on this strength using the outstanding talent of both companies to deliver enhanced value to patients, customers, employees and shareholders.*

- *All customers will benefit from increased functional, geographical and therapeutic scale as well as expansive healthcare technology innovation.*

- *The combination will address the growing market need for de-centralised and hybrid trial solutions from a differentiated combination of mobile and connected health platforms, a global site network, home health service and wearables expertise.*

- *The combined business will be no. 1 or 2 in key clinical market segments and have formal strategic partnerships with a majority of the top 20 biopharma companies, providing a platform for growth and innovation.*

- *Significant shareholder value creation expected as a result of strong industry momentum and leveraging best practice operating models, revenue, cost and tax synergies.*

- *ICON and PRA to host conference call at 8:30 a.m. EST 24th February.*

DUBLIN—(BUSINESS WIRE)—Feb. 24, 2021—*ICON* plc, (**NASDAQ: ICLR)**, a global provider of outsourced drug and device development and commercialisation services to the pharmaceutical, biotechnology and medical device industries, and government and public health organisations, today announced it has entered into a definitive agreement to acquire PRA Health Sciences, Inc. (NASDAQ: PRAH) in a cash and stock transaction valued at approximately $12 billion, with the per share merger consideration consisting of $80 in cash and 0.4125 shares of ICON stock. The consideration represents an approximately 30% premium to PRA's closing price as of February 23rd, 2021.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20210224005484/en/

The transaction brings together two high-quality, innovative and growing organisations with similar cultures and a shared focus on high quality and efficient clinical trial execution from Phase 1 to post-approval studies.

Biopharma and medical device customers of all sizes will benefit from broader service offerings and geographic footprint, deeper therapeutic expertise, expansive healthcare technology innovation, and functional talent and capabilities. PRA's mobile and connected

health platforms and real world data and information solutions together with ICON's Accellacare site network, home health services and wearables expertise, will be combined to deliver differentiated decentralised and hybrid trial solutions to meet growing customer needs.

The transaction is anticipated to be highly accretive delivering double-digit accretion in the first full year and growing to 20%+ thereafter, driven by growth momentum, estimated annual run-rate cost synergies of $150 million, and the combined effective tax rate decreasing to 14%, both to be realised in approximately 4 years.

**Dr. Steve Cutler, Chief Executive Officer, ICON plc, said:**
*"The combined company will create a new paradigm for accelerating clinical research and bringing new medicines and devices to market. Both ICON and PRA have track records of robust growth and performance and we are ready to build on this unrivalled position of strength, utilising the outstanding talent in both organisations. With broader and deeper operational scale combined with innovative technology and real world data solutions, we will enable all customers to reduce their development time and cost. We will be the leading provider of de-centralised and hybrid trial solutions through the integration of our data capabilities, health platforms and Accellacare site network. The transaction will be highly accretive from full year 1 post-close."*

**Colin Shannon, Chairman and Chief Executive Officer, PRA Health Sciences, said:**

*"I joined PRA 13 years ago to help build a company that would make a difference in the world and transform the way we developed new medicines. The way we do it now takes far too long and costs far too much. Critically ill patients can't wait for cures. Underserved populations can't wait for access. Every day counts. COVID-19 created a platform for change that we cannot ignore. The pandemic accelerated the adoption of mobile health technologies and healthcare intelligence tools – tools that PRA helped develop – at an unprecedented rate. The union of PRA and ICON will create an organization that has the people, data and technology to bring those cures to patients faster and more efficiently than ever before. We are thrilled to be joining with ICON, a company with a similar culture and values. I'm deeply indebted to PRA's 19,000 talented employees who have helped us bring this vision closer to reality. We stand together now because patients can't wait."*

**TRANSACTION                                                                                          DETAILS**

Under the terms of the transaction, PRA shareholders will receive per share, $80 in cash and 0.4125 shares of ICON stock. Upon completion of the transaction, PRA shareholders will own approximately 34 percent of the shares of the combined company and ICON shareholders will own approximately 66 percent.

**MANAGEMENT,            GOVERNANCE            AND            HEADQUARTERS**

The combined company will be headquartered in Dublin, Ireland. Dr. Steve Cutler, Chief Executive Officer of ICON plc, will serve as Chief Executive Officer of the combined company and Brendan Brennan, Chief Financial Officer of ICON plc, will serve as Chief Financial Officer. Ciaran Murray will serve as the Chairman of the Board of Directors.

Current PRA Chairman and Chief Executive Officer, Colin Shannon will join the board post the closing of the transaction along with one additional board member from PRA.

**FINANCING, CLOSING AND APPROVALS**
ICON intends to fund the cash portion of the transaction consideration through a combination of cash on hand and fully committed debt financing from Citi. The transaction is not subject to a financing condition.
The transaction has been unanimously approved by both Boards of Directors and is anticipated to close during quarter three of 2021, subject to regulatory and shareholder approvals and customary closing conditions. Until closing, PRA and ICON remain separate and independent companies.
**ADVISORS**
Centerview Partners is acting as lead financial advisor with Citi providing additional financial advisory services, and Cahill Gordon & Reindel serving as legal counsel to ICON plc. BofA and UBS Investment Bank are acting as financial advisors, and Paul Weiss serving as legal counsel to PRA Health Sciences.

**III.     The Preclusive Deal Protection Devices**

29.     To the detriment of the Company's public shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

30.     The Merger Agreement contains restrictive "no-shop" provisions that prohibit the members of the Board from soliciting proposals relating to alternative offers or business combinations.

31.     The "no-shop" provisions strictly prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

32.     Among other things, the "no-shop" provisions also require the Board to provide ICON with written notice of any Takeover Proposal, and further requires that the Board provide prior written notice of its intention to terminate the Merger Agreement due to receipt of a Superior Proposal so that ICON may negotiate with PRA following ICON's receipt of the notice and ICON can adjust the terms and conditions of the Merger Agreement so that the Takeover Proposal ceases

to be a Superior Proposal.

33.     In addition, the Merger Agreement provides that the Company will be required to pay to ICON a termination fee of $277,000,000.00 with respect to any termination under the no-shop provisions of the Merger Agreement.

34.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public shareholders' ability to disapprove the Proposed Transaction.

35.     Indeed, the Proposed Transaction was negotiated through a flawed and conflicted sales process pursuant to which PRA conducted insufficient outreach and steered the transaction to ICON by accelerating the merger process and negotiating the merger during the coronavirus pandemic.

36.     The aggregate effect of the preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted sales process pursuant to which the Proposed Transaction was negotiated, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

37.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**IV.      The Proxy Omits Material Information**

38.     On or about April 28, 2021, in order to convince PRA's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

39.     The special meeting of PRA's shareholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

40.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the transaction, and (ii) information that renders the Company's Financial Advisors' fairness analysis materially false, misleading, or incomplete.

### A.     The Proxy Omits Material Information Regarding the Background of the Transaction

41.     The Proxy states that PRA entered into a letter of intent with Company A, setting forth preliminary terms for Company A's acquisition of a PRA business unit, that Company A conducted "extensive due diligence" in connection with the letter of intent, and that discussions of a potential transaction with Company A occurred began around October 15, 2020 and concluded around January 21, 2021 because of "fundamental differences with respect to key commercial and other material terms," but fails to disclose (i) the nature of the "key commercial and other material terms" and the "fundamental differences" between PRA and Company A, and (ii) whether PRA entered into a standstill agreement with Company A and, if so, whether standstill obligations are ongoing and are subject to a "Don't Ask, Don't Waive" ("DADW") provision, which would effectively render the "fiduciary out" clause for the no-shop provisions illusory because it would prevent Company A from making a Superior Proposal to acquire PRA.  *See Koehler v. NetSpend Holdings, Inc.*, C.A. No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at *71-72 (Del. Ch. Ct. May 21, 2013).

### B.     The Proxy Omits Material Information Regarding the Fairness Analysis

42.     The Proxy also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations.  Without this information, shareholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

43.     With respect to the PRA Management Projections beginning on Page 110, the Proxy fails to disclose the line-items used to derive the Unlevered Free Cash Flow projections, including (i) Operating expenses, (ii) Depreciation and amortization, (iii) Interest, (iv) Taxes (or tax rate), (v) Changes in net working capital, (vi) stock-based compensation expense, (vii) Capital expenditures, and (viii) Any other line-items used to derive Unlevered Free Cash Flow.

44.     Further, with respect to the "ICON-Adjusted PRA Forecasts," the Proxy fails to disclose (i) the full rationale and basis for including a set of projections that includes "adjustments" to PRA Management's Projections, including (ii) who at PRA management "discussed" these "adjustments" with ICON, (iii) the timing and substance of such discussions, (iv) why PRA management authorized ICON to make "adjustments" to its own projections, and (v) whether the original PRA projections in fact continue to represent management's best guess for the Company's future financial results notwithstanding the "adjustments."

45.     With respect to BofA Securities' *Selected Publicly Traded Companies Analysis*

beginning on Page 91 and Page 94, the Proxy fails to disclose: (i) the objective criteria, if any, that BofA Securities relied upon in selecting the companies for the analysis, (iii) the individual multiples for each of the selected companies, (iii) BofA Securities' full rationale and basis for valuing PRA and ICON based on a range of EV/EBITDA (SBC-Unburdened) multiples of 14.0x to 17.5x for PRA and 15.5x to 18.0x for ICON for the 2021 calendar year, and 12.5x to 16.0x for PRA and 14.0x to 16.5x for ICON for the 2022 calendar year, and (iv) BofA Securities' full rationale and basis for valuing PRA and ICON based on a range of Price/EPS (SBC/Amort.-Unburdened) multiples of 18.0x to 25.0x for PRA and 20.0x to 26.0x for ICON for the 2021 calendar year, and 15.5x to 22.0x for PRA and 17.0x to 22.5x for ICON for the 2022 calendar year.

46.     With respect to BofA Securities' *Selected Transactions Analysis* beginning on Page 92, the Proxy fails to disclose: (i) the objective criteria that BofA Securities relied upon in selecting the transactions analyzed, including the enterprise values in each transaction, (ii) whether each transaction contemplated cash consideration, stock consideration, or a cash/stock mix, and (iii) BofA Securities' full rationale and basis for selecting a range of EBITDA (SBC-Unburdened) multiples of 12.0x to 14.0x and 11.0x to 13.0x for the 2020 and 2021 years, respectively, including which (if any) of the selected precedent transactions were deemed most similar to the Proposed Transaction and how BofA Securities accounted for the fact that the multiples in the other transactions were not affected by the Covid-19 pandemic.

47.     With respect to BofA Securities' *Discounted Cash Flow Analysis* ("DCF") beginning on Pages 93 and 95, the Proxy fails to disclose: (i) the full rationale and basis for selecting a discount rate range of 7.5% to 10.0% for PRA and 7.25% to 9.5% for ICON, including the actual inputs that were used for each of PRA and ICON, (ii) the terminal values and BofA Securities' full rationale and basis for selecting a range of terminal year EBITDA (SBC-Unburdened) multiples of 13.0x to 16.5x for PRA and 13.0x to 17.5x for ICON, and (iii) a full sensitivity table based on the entire range

of discount rates and multiples.  Without this information, it is impossible to determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value because a banker can make any transaction appear "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration.

48.     With respect to the *Miscellaneous* disclosures on Page 96, the Proxy states that BofA Securities has performed certain corporate and/or investment banking services for PRA during the two-year period leading up to January 31, 2021 and received $4 million for these financial services but fails to (i) clearly disclose whether BofA Securities has actually provided financial services to ICON and, if so, (ii) identify the services BofA Securities has provided to ICON and (iii) disclose the amount of compensation that BofA Securities has received from ICON in connection with these services.

49.     With respect to UBS' *Selected Public Company Analysis* beginning on Page 100, the Proxy fails to disclose: (i) the objective criteria, if any, that UBS relied upon in selecting the companies for the analysis, and (ii) UBS' full rationale and basis for valuing PRA and ICON based on a range of Adjusted EBITDA multiples of 16.5x to 17.5x for PRA and 16.5x to 17.5x for ICON for the 2021 calendar year, and 15.0x to 16.0x for PRA and 15.0x to 16.0x for ICON for the 2022 calendar year.

50.     With respect to UBS' *Selected Transactions Analysis* beginning on Page 101, the Proxy fails to disclose: (i) the objective criteria that UBS Securities relied upon in selecting the transactions analyzed, including the enterprise values in each transaction, (ii) whether each transaction contemplated cash consideration, stock consideration, or a cash/stock mix, and (iii) UBS' full rationale and basis for selecting a range of Adjusted EBITDA) multiples of 12.5x to 14.5x and 12.0x to 13.5x for the 2020 and 2021 years, respectively, including which (if any) of the selected

precedent transactions were deemed most similar to the Proposed Transaction and how UBS accounted for the fact that the multiples in the other transactions were not affected by the Covid-19 pandemic.

51.     With respect to UBS' *Discounted Cash Flow Analysis* beginning on Page 102 and Page 105, the Proxy fails to disclose: (i) the full rationale and basis for selecting a discount rate range of 9.00% to 10.00% for PRA and ICON, including the actual inputs that were used for each of PRA and ICON, (ii) the terminal values and UBS' full rationale and basis for selecting a range of terminal year Adjusted EBITDA multiples of 15.0x to 16.0x for PRA and ICON, and (iii) a full sensitivity table based on the entire range of discount rates and multiples.

52.     With respect to the *Miscellaneous* disclosures on Page 106, the Proxy fails to (i) clearly disclose whether UBS Securities has provided financial services to PRA and/or ICON during the two-year period leading up to the transaction and, if so, (ii) identify the services UBS has provided to PRA and/or ICON and (iii) disclose the amount of compensation that UBS has received from PRA and/or ICON in connection with these services.

53.     If a proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed

in the Proxy misleading.

54.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

55.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

57.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

58.    The omission of information from a proxy will violate Section 14(a) and Rule 14a-9

if other SEC regulations specifically require disclosure of the omitted information.

59.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

60.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

61.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above

has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

63.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

66.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of

the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

72.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 18, 2021

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

  */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*